UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| RONALD RUBLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  1:15 CV 141 JMB |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This action is before the Court, pursuant to the Social Security Act ("the Act"), 42 U.S.C. §§ 401, *et seq.*, authorizing judicial review of the final decision of the Commissioner of Social Security (the "Commissioner"), following a decision that Plaintiff was not entitled to Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under the Act. The matter is fully briefed, and for the reasons discussed below, the Commissioner's decision is affirmed.  All matters are pending before the undersigned United States Magistrate Judge with consent of the parties, pursuant to 28 U.S.C. § 636(c).

## I.      Procedural History & Summary of Memorandum Decision

On October 9, 2002, Plaintiff Ronald Ruble was found disabled, beginning July 13, 2001, because of a non-union fracture of the left leg, under an application for disability insurance benefits that he filed on July 17, 2001.  (Tr. 17-18)[1]  On August 24, 2010, the Social Security Administration reviewed Plaintiff's claim for continuing disability, and concluded that his disability ceased on August 1, 2010.  Plaintiff appealed the termination of benefits, and following a hearing,

---

[1]"Tr." refers to the page of the administrative record filed by the Defendant with her Answer (ECF No. 8/filed October 5, 2015)

an Administrative Law Judge ("ALJ") found on February 24, 2012, Plaintiff's severe impairments of status post lower extremity fractures and inhalation burn injuries, recurrent left foot calluses, hypertension, obstructive sleep apnea, depression, and post-traumatic stress disorder ("PTSD") did not meet or equal the severity criteria of any listed impairment and only restricted Plaintiff to sedentary exertional level work. (Tr. 31-44) The ALJ found that Plaintiff was no longer disabled as of August 1, 2010, with his disability eligibility terminating on October 31, 2010. On March 19, 2013, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. (Tr. 58-62) The decision regarding Plaintiff's continuing eligibility for benefits is not under review herein.

On August 7, 2012, Plaintiff filed Applications for Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq., and Disability Insurance Benefits under Title II of the Act, 42 U.S.C. §§ 401 et. seq. (Tr. 127-33, 703-08) Plaintiff claimed that his disability began on July 13, 2001, as a result of breathing problems, broken legs, back pain, reading comprehension problems, walking problems, depression, anxiety, and PTSD. On initial consideration, the Social Security Administration denied Plaintiff's claims for benefits. Plaintiff requested a hearing before an ALJ. On April 15, 2014, a hearing was held before the same ALJ who adversely decided his continuing eligibility. (Tr. 722-84) Plaintiff testified and was represented by counsel. (Id.) Vocational Expert Barbara Myers and Medical Experts Drs. Edwin L. Bryan and Thomas England, Ph.D., also testified at the hearing. (Tr. 57-60, 74-75, 113-22, 754-69) Noting that Plaintiff had alleged a disability onset date of July 13, 2001, the ALJ construed such as an implicit request to reopen the adverse February 24, 2012, decision that his disability ended on August 1, 2010. The ALJ denied the request based on the doctrine of *res*

*judicata*,[2] finding the February 24, 2012, unfavorable decision "involved the same rights on the same facts and on the same issue or issues" and Plaintiff "has produced no new or material evidence or other good reason to reopen that unfavorable hearing decision." (Tr. 18) Plaintiff does not dispute this *res judicata* finding.

Accordingly, in the May 29, 2014, decision, the ALJ only addressed whether Plaintiff became disabled at any time after the February 24, 2012, decision. (Tr. 14-30) The ALJ again concluded that Plaintiff was not disabled. Plaintiff appealed. After considering the representative's brief and additional medical records, the Appeals Council found no basis for changing the ALJ's decision and denied Plaintiff's request for review on June 5, 2015. (Tr. 6-13, 201-02, 609-702) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

Plaintiff filed the instant action on August 3, 2015. Accordingly, Plaintiff has exhausted his administrative remedies and the matter is properly before this Court. Plaintiff has been represented by counsel throughout all relevant proceedings.

In his initial brief to this Court, Plaintiff raises two issues, although these issues require the Court to consider several subsidiary matters. First, Plaintiff argues that the ALJ erred in concluding that he did not meet or equal a listing-level impairment based on Dr. Bryan's testimony and the medical record. In his initial brief, Plaintiff did not specify which listing he allegedly met, or identify which impairment or combination of impairments meets or medically

---

[2]"Res judicata bars subsequent applications for SSDI and SSI based on the same facts and issues the Commissioner previously found to be insufficient to prove the claimant was disabled." Hillier v. Social Security Administration, 486 F.3d 359, 364 (8th Cir. 2007). In addition, "[c]ourts ordinarily lack jurisdiction to review the Secretary's application of res judicata to a claim for social security benefits." Davis v. Sullivan, 977 F.2d 419, 420 (8th Cir. 1992).

equals a listing. Second, Plaintiff argues that the ALJ erred in discounting his credibility and in assessing his Residual Functional Capacity ("RFC"). The Commissioner filed a detailed brief in opposition contending that the ALJ's decision is based upon substantial evidence. In his reply brief, Plaintiff contends that the ALJ failed to make a determination as to Listing 1.04(C) (disorders of the spine) and to consider his impairments in combination. Plaintiff also argues that, in making an adverse credibility determination, the ALJ erroneously found that Plaintiff's daily activities were inconsistent with his allegations of disability.

As explained below, the Court has considered the entire record in this matter. Because the decision of the Commissioner is supported by substantial evidence, it will be affirmed. The undersigned will first summarize the decision of the ALJ and the administrative record. Next, the undersigned will address each of the issues Plaintiff raises in this Court.

## II. Decision of the ALJ

In a decision dated May 29, 2014, the ALJ determined that Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2015. (Tr. 20) The ALJ acknowledged that the administrative framework required him to follow a five-step, sequential process in evaluating Plaintiff's claim. (Tr. 18-20) At step one, the ALJ concluded that Plaintiff had not engaged in any substantial gainful activity from February 25, 2012, (the date the ALJ issued an unfavorable decision finding his disability ceased on August 1, 2010), and that Plaintiff meets the insured status through December 31, 2015. (Tr. 20) At step two, the ALJ found Plaintiff had the following severe impairments during the relevant time period: degenerative joint disease of the lumbar spine and knees, chronic obstructive pulmonary disease, obstructive sleep apnea, recurrent foot calluses, residuals of status-post left carpal tunnel syndrome with surgical

- 4 -

release, hypertension, ulcer, gastritis, obesity, mood disorder, PTSD, and learning disorder. (Tr. 20-24) The ALJ further concluded, however, that none of Plaintiff's impairments, either singly or in combination, significantly limited his ability to perform basic work-related activities for 12 consecutive months. (Tr. 24-25) In making his Residual Functional Capacity ("RFC") determination, the ALJ found that Plaintiff has the capacity to perform light work, except for: lifting or carrying more than 20 pounds occasionally and 10 pounds frequently; standing or walking more than 2 hours in an 8-hour workday; sitting more than 6 hours in an 8-hour workday; standing or sitting continuously without alternating position occasionally to stretch while remaining at the work station; ambulating over unimproved terrain; operating foot controls more than occasionally; climbing ladders, ropes, or scaffolds, kneeling, or crawling; stooping or crouching more than occasionally; exposure to pulmonary irritants, extreme heat, cold, humidity, or whole body vibration; and performing more than simple, repetitive tasks with no close interaction with the general public or reading and writing. (Tr. 25-28)

The ALJ made an adverse credibility finding regarding Plaintiff's "allegations that his impairments, either singly or in combination, produce symptoms and limitations of a severity to prevent all sustained work activity." (Tr. 26) The ALJ also found that Plaintiff's "daily activities are inconsistent with his allegations of disabling symptoms and limitations. [Plaintiff] is able to essentially live and function independently, perform light household chores, go grocery shopping, and drive an automobile.... [Plaintiff] testified in substance that his daily activities are limited, but included household chores, mowing the lawn with a riding mower, hunting, driving, and cooking." (Id.) In short, the ALJ concluded that Plaintiff failed to support his claim of disability with sufficient, relevant evidence. The ALJ summarized his conclusions as follows:

> The objective medical evidence of record supports a finding that the [plaintiff] has impairments that impose symptoms and limitations that preclude the [plaintiff] from performing more than significantly limited range of light exertional level work activity with a sit/stand option and non-exertional postural, environmental, and mental limitations. Weighing all relevant factors, the undersigned concludes that the [plaintiff's] subjective complaints do not warrant any further limitation.

(Tr. 28) The ALJ further found that, considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs existing in significant numbers in the national economy he could perform including a collater operator and small parts assembler. (Tr. 29)

## III.    Administrative Record

The administrative record in this matter includes extensive medical records. The Court has reviewed the entire record, including the evidence relevant to the relevant time period. The following is a summary of pertinent portions of the record to provide context to the Court's decision.

### A.    The Hearing Before the ALJ

The ALJ conducted a hearing on April 15, 2014. Plaintiff was present and represented by an attorney. Also present was a Vocational Expert ("VE"), Barbara Myers, two Medical Experts, Drs. Edwin L. Bryan and Thomas England, and Braden Bremmon, Plaintiff's case manager.

#### 1.    Plaintiff's Testimony

Plaintiff testified primarily in response to questions posed by his attorney, with additional questions interjected by the ALJ. At the time of his hearing, Plaintiff was forty-nine years old. According to Plaintiff, his back and breathing problems prevent him from working. Plaintiff last worked as a maintenance supervisor at Farmington Prison in 2000-01.

A pain management doctor at Advanced Pain Center has treated Plaintiff with a

medication regimen of Hydrocodone, Tramadol, and Lidoderm patches. Plaintiff testified that the medications do not do much good. Plaintiff does not wear any special braces, wraps, or supports, or use a cane or crutch. Plaintiff explained that when he has to walk on unlevel ground or in the woods to hunt, he uses a stick or holds onto trees to stabilize himself.

Plaintiff testified that he does his own household chores, cooking, cleaning, and laundry gradually throughout the day. Plaintiff cuts the grass on a riding mower but he has to take breaks. Plaintiff went deer hunting within the last year, and he shot a deer two years earlier using a rifle. Plaintiff uses a four wheeler to access the woods. Plaintiff testified that he already has his camouflage out for turkey season. Plaintiff testified that he regularly visits two to three friends, and he usually attends church on Sundays. Plaintiff indicated that he struggles when he carries a fifty pound bag of dog food. Plaintiff testified that, although it takes him longer than the average person, he can take care of his personal needs.

Plaintiff testified that he has problems walking and going up and down stairs. Plaintiff cannot walk a city block without sitting down and taking a break. Standing or stooping hurts Plaintiff's lower back. Plaintiff's sister helped him complete some paperwork because he does not comprehend half of what he reads. Plaintiff changes positions to relieve the pain in his back.

Dr. Harness of Highland Health is Plaintiff's primary care doctor. Plaintiff testified that he had problems completing the pulmonary function studies.

### 2. Testimony of Braden Bremmon

Mr. Braden Bremmon also testified at the hearing. Mr. Bremmon works at the Family Counseling Center as Plaintiff's case manager responsible for monitoring Plaintiff's mental stability and depression and encouraging healthy lifestyles including weight reduction. Mr.

Bremmon reported that he has seen Plaintiff three times a month for the last two years. Mr. Bremmon testified that he has observed Plaintiff's gait and walk. Mr. Bremmon noted Plaintiff to be a slow, guarded and cautious walker, and that Plaintiff has difficulty walking on carpet. Mr. Bremmon noted that Plaintiff cannot complete paperwork without assistance because he lacks the necessary comprehension level and has memory problems. With respect to Plaintiff's PTSD and depression, Mr. Bremmon testified that Plaintiff has been stable since he started seeing Plaintiff.

### 3. Testimony of Medical Expert

Dr. Edwin L. Bryan is a licensed physician, board certified in internal medicine, with forty years of experience. Dr. Bryan testified based on his review of the medical records and after listening to the hearing testimony. Dr. Bryan indicated that he heard nothing inconsistent between the hearing testimony and the medical records. Dr. Bryan testified that, from about August, 2012, to the present, Plaintiff's impairments included mental impairments that limited intellectual function, PTSD, depression, and mood disorder, and Plaintiff's physical impairments included hypertension, chronic obstructive pulmonary disease worsened by smoke inhalation during a house fire, gastric ulcer with GI bleeding, carpal tunnel surgery in 2009, obesity, ongoing obstructive sleep apnea, abnormal gait, callous formation in his foot, and multi-level disc bulges with ongoing back pain as evidenced by an MRI of Plaintiff's lumbar spine on April 3, 2014. Dr. Bryan opined that Plaintiff has "a combination of impairments that grossly affect his ability to function particularly vocationally. I cannot ... fit him specifically into a listing, but I do think I can comfortably state that his impairments in combination would not permit the same physical activity previous - like his previous activity at the dart factory." (Tr. 758) Dr. Bryan testified that he agreed with the Family Counseling Center's early findings that Plaintiff appeared incapable of

sustaining gainful activity, and he would not have the capacity to perform work involving any mental activity. Dr. Bryan opined that Plaintiff's mental limitations would preclude Plaintiff's ability to perform meaningful sedentary work. Dr. Bryan concluded that, in addition to being limited to sedentary work, Plaintiff would also need to get up and move around, change positions, and stretch.

Dr. Bryan acknowledged that the MRI report he reviewed showed Plaintiff has moderate to severe spinal stenosis, and he agreed that that type of stenosis could cause lower extremity pain. Dr. Bryan found Plaintiff's testimony regarding difficulty walking on uneven surfaces to be credible. Nonetheless, when asked about meeting muscoskeltal Listing 1.04 dealing with spinal stenosis leading to inability to ambulate effectively, Dr. Bryan opined that he could not testify that the listing is clearly met, noting that Plaintiff's inability to ambulate effectively is caused by his knees, not his spine. Dr. Bryan noted that there was no clear evidence in the extensive medical records showing Plaintiff had lumbar spinal stenosis resulting in lower extremity pain.

### 4. Testimony of Psychological Expert

Dr. Thomas England, a psychologist, found in substance that Plaintiff's mental impairments imposed mild to moderate mental limitations since 2012. Dr. England testified that the medical record shows Plaintiff's depression appears, for the most part, to respond well to Cymbalta. Dr. England opined that the record showed Plaintiff's difficulty to be a mild limitation in the area of reading, comprehension, and writing. Although a diagnosis of PTSD was established by the medical record, Dr. England noted Plaintiff had not received much treatment or counseling for that condition.

### 5.  Testimony of Vocational Expert

Vocational Expert ("VE") Ms. Barbara Myers testified at the hearing.  The VE characterized Plaintiff's vocational background to include work experience as a maintenance supervisor.  Plaintiff's job duties included taking contractors around a prison and monitoring the contractor's work.  (Tr. 773)

The ALJ asked the VE to assume someone similar to Plaintiff in age, education, and the same past work experience who can

> lift 20 pounds on occasion, 10 pounds frequently, could stand and/or walk about two hours in an eight hour work day, could sit about six, and that the person should avoid concentrated exposure to noxious fumes, odors, dust, and gases.  And also avoid concentrated exposure to extreme cold, heat, and humidity, should avoid climbing ladders, ropes, and scaffolds, and should avoid ambulating on unimproved terrain like open fields, construction sites.  Avoid, what would expose him to whole body vibration.  The person would be limited to only occasional stoop, bending, crouching. No kneeling or crawling, and avoid more than occasional operation of foot controls bilaterally.

(Tr. 775)  The ALJ also limited the hypothetical worker "to simple and/or repetitive work that didn't require close interaction with the public.  And by simple and/or repetitive, mostly working with things, no large demands on reading and writing."  (Tr. 776)

The VE opined that such a hypothetical worker could not perform Plaintiff's past work, could perform other light and unskilled jobs such as a collator operator, a small part assembler, and a bench assembler.  The VE opined that the individual could perform sedentary jobs including a laminator and a circuit board assembler.   The VE indicated that if the individual would have to consistently miss two or more days a month, this would preclude competitive employment after a brief period.  The VE indicated that, a further requirement that the individual would be late for work or leave early on a weekly basis, or required an additional random break, would preclude

the individual from competitive employment.

Next, the ALJ asked the VE if the individual could remain at work but because of a medical condition would be distracted and not be productive twenty percent of the day. The VE indicated that this would preclude competitive employment.

The ALJ modified the first hypothetical by removing the not appearing for work accommodation and adding the ability to change positions briefly to stretch while remaining at the work station. The VE opined that this accommodation would not preclude the performance of the light or sedentary jobs she cited earlier.

### B.    Forms Completed by Plaintiff

In his Function Report - Adult, Plaintiff listed cooking, picking up, wiping off sinks and stove, some vacuuming, and riding a mower as his activities. (Tr. 162)  Plaintiff reported being able to drive a car and a four-wheeler, to go out alone, hunt or fish on a four-wheeler, and attend church on Sundays. (Tr. 162-63)

## IV.    Medical Records and Source Opinion Evidence

### A.    General History

The medical evidence in the record shows that Plaintiff has a history of degenerative joint disease, chronic obstructive pulmonary disease ("COPD"), obstructive sleep apnea, hypertension, back pain, gastritis, obesity, mood disorder, and PTSD. (Tr. 203-702)  Although the Court has carefully considered all of the evidence in the administrative record in determining whether the Commissioner's adverse decision is supported by substantial evidence, only the medical records most relevant to the ALJ's decision and the issues raised by Plaintiff on this appeal are discussed.

**B.**    **St. Louis University Hospital - Dr. Robert Burdge** (Tr. 296-302)

On July 15, 2001, Dr. Robert Burdge surgically repaired a fracture of Plaintiff's right tibial plateau. On October 11, 2001, Dr. Burdge surgically repaired a fracture of Plaintiff's left tibia.

**C.**    **St. John's Mercy Medical Center Treatment Records** (Tr. 565-691)

On March 2, 2009, Plaintiff was admitted to St. John's Mercy Medical Center for treatment of injuries he sustained in a house fire, including body surface area burns, inhalation burns, and carbon monoxide toxicity. On admission, Plaintiff tested positive for amphetamines. As part of his treatment, Plaintiff was chemically paralyzed until April 1, 2009. At that time, Plaintiff's only notable past medical history was for bilateral extremity fractures in 2001 resulting from a motorcycle accident. On April 21, 2009, Plaintiff was discharged to a rehabilitation hospital. His final diagnoses at the time of discharge included malnutrition, physical deconditioning, anemia, hypertension, pneumonia, and deep vein thrombosis.

**D.**    **Wayne Medical Center - Dr. Andrew Gayle** (Tr. 228-83)

Between February 21, 2011, and May 3, 2012, Dr. Andrew Gayle treated Plaintiff for hypertension, PTSD, sleep apnea, and leg pain. (Tr. 228-45)

On February 21, 2011, Dr. Gayle treated Plaintiff's leg pain. Plaintiff reported his pain was sharp, severe, unchanged, and that his symptoms occurred frequently. Musculskeletal examination of Plaintiff's right tibia and fibula revealed normal strength and tone, normal lower extremity movement and range of motion, and no instability. Examination of Plaintiff's left tibia and fibula revealed a normal range of motion, normal strength and tone, and no instability, laxity, or crepitus. Dr. Gayle found moderate to generalized tenderness in both lower legs and prescribed Naprosyn. An x-ray of Plaintiff's left knee showed no acute fracture or dislocation.

An x-ray of Plaintiff's right ankle revealed a posterior plantar calcaneal spur, and of his right leg showed mild degenerative changes of the medial joint compartment.

On March 2, 2011, Plaintiff presented with snoring and nocturnal gasping and reported that he was still smoking one package of cigarettes each day. Examination of Plaintiff's right tibia and fibula revealed normal strength and tone, normal lower extremity movements, normal range of motion, and no instability, laxity, or crepitus. Examination of Plaintiff's left tibia and fibula revealed normal strength and tone, normal lower extremity movements, normal range of motion, and no instability, laxity, or crepitus. Dr. Gayle diagnosed Plaintiff with hypertension, encouraged him to diet and exercise, and scheduled a sleep study.

In an appointment for leg pain on June 1, 2011, Dr. Gayle noted that Plaintiff was not currently being treated for his leg pain, and Plaintiff saw "ortho, had one synvisc in one knee and did not go back yet." (Tr. 237) Examination of Plaintiff's lower extremities revealed normal strength and tone, normal lower extremity movements, normal range of motion, and no instability, laxity, or crepitus. Dr. Gayle prescribed Meloxicam and discontinued Naproxen.

On July 29, 2011, Plaintiff returned for a hypertension and leg pain exam. During follow-up treatment on August 12, 2011, Dr. Gayle ordered the continued use of a CPAP machine for Plaintiff's obstructive sleep apnea.

On March 14, 2012, Plaintiff returned for hypertension and obstructive sleep apnea exams. Plaintiff reported smoking one package of cigarettes a day. During treatment on May 3, 2012, Dr. Gayle encouraged Plaintiff to lose weight.

E.    **Family Counseling Center - Kathleen Lasar, PMHNP-BC** (Tr. 204-27, 368-79, 547-64)

Between November 16, 2010, and January 14, 2013, Kathleen Lasar, a nurse practitioner, treated Plaintiff for pain, anxiety, anger, and PTSD.  (Tr. 204-83, 368-379)

On November 16, 2010, Ms. Lasar completed a psychiatric evaluation.  Plaintiff reported being depressed after a house fire and his girlfriend dying in the fire.  Plaintiff usually smokes marijuana one to two times a week.  His hobbies include hunting and fishing.  Plaintiff reported that he worries excessively about money, and "he is unable to work related to his inability to read, think, or comprehend the written language.  He is unable to do physical labor anymore related to his physical injuries and chronic pain."  (Tr. 564)  Ms. Lasar's diagnoses included PTSD, learning disability, chronic pain, and low income.

On January 5, 2011, Plaintiff received treatment for pain, anxiety, and anger.  The mental examination showed Plaintiff had fair judgement and insight.  Plaintiff returned for follow-up treatment on March 28 and April 11, 2011, and reported significant pain and disability and difficulty concentrating and comprehending.  Plaintiff relied on his family for financial support.  Ms. Lasar noted that Plaintiff "[a]ppears unable to retain gainful employment due to significant disability" and prescribed Cymbalta.  (Tr. 217)  On October 26, 2011, Plaintiff reported that he had stopped taking Cymbalta, and he had refused to take pain medications due to possibility of addiction and no improvement of symptoms.  Plaintiff reported a desire to work but not having the ability to complete a full day's work.  Plaintiff reported that he continues to smoke and has difficulty walking.  Ms. Lasar observed Plaintiff to have improved mood and anxiety symptoms and continued Plaintiff on Cymbalta.  After running out of Cymbalta, Plaintiff reported feeling

irritable and angry on November 30, 2011. On December 29, 2011, Plaintiff reported having fair results after taking Cymbalta, including less anger and fewer mood swings.

In a December 29, 2011, letter in response to counsel's letter, Ms. Lasar diagnosed Plaintiff with PTSD and mood disorder otherwise not specified, as a result of a head injury. Ms. Lasar noted that she had "seen [Plaintiff] in my clinic a total of 4 times, the last being today." (Tr. 547) Ms. Lasar opined that Plaintiff "suffers significant impairment related to those diagnoses, as evidenced by difficulty concentrating and retaining information, mood instability and irritability, flashbacks and nightmares to previous trauma, specifically a fire in 2009 in which he suffered a brain injury which rendered him unconscious." (Id.) Ms. Lasar also noted that Plaintiff "has a low educational level and poor reading comprehension skills, causing him to have difficulty following instructions in the workplace." (Id.) Ms. Lasar concluded by opining that Plaintiff's "mental problem is marked and limits social functioning, concentration, persistence, and pace. In my opinion, [Plaintiff] does not have the functional capacity to do work requiring significant mental activities for pay or profit." (Id. at 548)

During treatment on June 6, August 7, and October 4, 2012, Plaintiff reported increased shortness of breath since the house fire in 2009. Ms. Lasar noted that Plaintiff's symptoms had responded poorly to medication, and Plaintiff was a poor candidate for psychotherapy due to low cognition. Plaintiff reported he continued to smoke despite his shortness of breath.

On November 6, 2012, Ms. Lasar completed a psychiatric evaluation. Plaintiff reported having anxiety and being depressed, and that Cymbalta helped him cope. Plaintiff also reported financial issues and felt guilty that his grandmother financially supports him. Plaintiff expressed interest in obtaining "part time sheltered employment which would not affect his application for

disability." (Tr. 376)

In follow-up treatment on January 14, 2013, Plaintiff reported financial difficulties because he no longer received disability checks.

F.     **Family Counseling Center - Dr. Juan Carlos Salazar** (Tr. 380-400)

On September 16, 2013, and November13, 2014, Dr. Juan Carlos Salazar treated Plaintiff for PTSD and depressive disorder. (Tr. 204-83, 368-379)

On September 16, 2013, Dr. Salazar completed a psychiatric evaluation and found Plaintiff had presented elements of depression and PTSD, and noted that Plaintiff had obtained benefit from medication treatment. Plaintiff explained that he had decided to transfer his care from Ms. Lasar after experiencing some side effects from medication adjustments ordered by Ms. Lasar. Dr. Salazar, however, noted that "[t]he patient is actively seeking help with his disability process and apparently when submitting paperwork, the paperwork was thrown out as it came from a nurse practitioner and not a physician, the reason why he prefers for me to undertake his care directly." (Tr. 380)

On November 13, 2013, Corey Crutchfield, LMSW, completed an interpretive summary. Plaintiff's goals included "I need to continue getting help to get my social security benefits back so that I have an income," treatment for anxiety and depression, and losing weight. (Tr. 389) Plaintiff reported feeling better with the treatment for his depression but he was still worried about his finances. Plaintiff indicated that he likes to exercise, garden, cook, fix things, hunt, fish, ride dirt bikes and motorcycles, and he can do his own shopping, cooking, and cleaning without homemaker services. Plaintiff reported he stopped working when he was laid off.

In follow-up treatment on November 14, 2013, Plaintiff reported sleeping better after

adjusting his Cymbalta dosage and feeling more balanced emotionally. Plaintiff reported that his

PTSD symptoms had been fairly controlled on medications but he was still dealing with financial

difficulties. On January 30, 2014, Plaintiff reported being fairly stable emotionally.

G.    **Poplar Bluff - Dr. Ross Andreassen** (Tr. 303-20, 401-71)

Between May 31, 2012, and December 23, 2013, Dr. Ross Andreassen treated Plaintiff for

tobacco dependence, lumbosacral spondylosis without myclopathy, lumbar intervertebral disorder,

sciatia, osteoarthritis, and long term use of opiate analgesic. (Tr. 303-20, 401-71)

In the initial treatment on May 31, 2012, Dr. Andreassen evaluated Plaintiff's low back

pain. Plaintiff reported his functional impairment to be moderate but when pain is present, it

interferes with his sleep. Dr. Andreassen observed Plaintiff to have a normal gait, and

examination of his lumbar spine showed tenderness. Based on Plaintiff's history, physical

examinations, and available tests, Dr. Andreassen made a diagnosis of lumbar discogenic pain,

lumbar facet arthropathy/spondylosis, and ostreoarthritis. In follow-up treatment on June 14,

2012, Plaintiff reported that his back pain was a moderate functional impairment, interfering only

with some daily activities. Dr. Andreassen offered medications including Hydrocodone, and an

injection treatment.

Plaintiff returned on July 11, 2012, complaining of increased pain, and that pain

medications helped and improved his daily functioning and sleep. Musculskeletal examination

showed Plaintiff's gait and station to be normal. Plaintiff reported his physical functioning was

improving. On August 8, 2012, Plaintiff reported having pain and being unable to function well

without pain medications. Dr. Andreassen's examination showed Plaintiff's gait and station to be

normal, and he found Plaintiff able to participate in an exercise program. Dr. Andreassen advised

Plaintiff to cease smoking, to continue with a home exercise program, and to increase his activity.

In follow-up treatment on September 6 and October 4, 2012, Plaintiff reported having left leg pain. Examination showed Plaintiff's gait and station to be normal with tenderness of his lumbar spine. Dr. Andreassen continued Plaintiff's medication prescription. Plaintiff returned on November 1, 2012, complaining of increased leg pain and that his pain medications not helping. Examination showed Plaintiff's gait and station to be normal, with tenderness of his lumbar spine. Dr. Andreassen continued medications and urged Plaintiff to stop smoking, increase his activity, and reduce his weight by 25 pounds. On November 29, 2013, Plaintiff reported hurting his right wrist when falling while hunting. Examination showed Plaintiff's gait and station to be normal, with tenderness of his lumbar spine. Plaintiff reported having leg pain on December 27, 2012. Examination showed diffusely moderate leg pain, with his gait and station to be normal.

On January 22 and February 9, 2013, Plaintiff reported having low back and right leg pain, and that his medications were helping manage his pain and improving his daily functioning. On March 19, 2013, Plaintiff reported having continued back and leg pain. Examination of his lumbar/sacral spine showed moderate tenderness in the center of his spine and around the facet joints. Plaintiff returned for a medication refill on April 16, 2013, and Dr. Andreassen noted Plaintiff's gait to be normal and moderate tenderness in the center of his lumbar spine.

On May 14 and June 11, 2013, Dr. Andreassen provided treatment for Plaintiff's back and leg pain. Examination of Plaintiff's lumbar/sacral spine showed moderate tenderness at the center of his spine and facet joints. Dr. Andreassen continued Plaintiff's medication regimen. On July 9, 2013, Plaintiff returned complaining of chronic bilateral lower leg pain. Dr. Andreassen referred Plaintiff to a podiatrist for a foot evaluation and orthotic arch support.

On September 3 and August 6, 2013, Plaintiff reported having bilateral leg pain. Plaintiff reported seeing Dr. Vanlandingham on referral and receiving arch supports that have helped relieve some of his back pain. On October 1 and 29, 2013, Plaintiff again reported having bilateral leg pain. Examination of Plaintiff's lumbar/sacral spine showed moderate tenderness in the center of his spine and around the facet joints. Dr. Andreassen continued Plaintiff's medication regimen.

On November 25 and December 23, 2013, Plaintiff returned for treatment of his bilateral leg pain. Examination of his lumbar/sacral spine showed moderate tenderness in the center of his spine and around the facet joints. Dr. Andreassen continued Plaintiff's medication regimen.

### H. Annapolis Family Clinic -Glenda Counts, APN/ Harry Harness, D.O./Dr. Jonathon Privett (Tr. 284-94, 340-67, 493-522, 694-98)

Between April 17, 2012, and October 30, 2013, Dr. Harry Harness and Glenda Counts, APRN, FNP, treated Plaintiff for knee pain, back pain, depression, and COPD. (Tr. 284-94, 340-67, 493-522, 694-98)

On April 17, 2012, Plaintiff reported having popping in his left knee when he straightened his knee. Examination by Glenda Counts, APRN, FNP, showed abnormalities in Plaintiff's left knee and pain with palpation. Ms. Counts observed Plaintiff to have "[a]bnormal slow ambulation due to problems with knees." (Tr. 285) An x-ray of Plaintiff's left knee showed degenerative joint disease. Two weeks later, on April 27, 2012, Plaintiff reported continued severe left knee pain and requested a stronger pain medication. Ms. Counts observed Plaintiff to have an abnormal, slight limp. Ms. Counts scheduled a CT scan of Plaintiff's left knee and referred him to pain management.

In a follow-up visit on May 29, 2012, Plaintiff complained of pain in his legs and back and little improvement with pain medications, but he admitted running out of Tramadol a few days earlier. Examination showed pain upon palpitation of his lumbar spine. An x-ray of Plaintiff's chest showed no acute findings. During treatment on August 31, 2012, Plaintiff explained that he had been on disability for several years but after a finding that he could work, his disability was discontinued. Plaintiff reported having severe lower back pain when standing or walking for long periods of time, and that sitting down provided relief. On November 30, 2012, Plaintiff returned for follow-up treatment and reported being treated at Advanced Pain Clinic for pain management. Ms. Counts observed Plaintiff's gait and stance to be normal.

On May 31, 2013, Plaintiff returned for his six-month follow-up treatment. Dr. Harness found Plaintiff's gait and stance to be normal. On July 1, 2013, Plaintiff returned for medication refills and reported having stress since leaving his girlfriend.

On October 7, 2013, Plaintiff had a routine visit for depression and COPD. Plaintiff reported taking Cymbalta and doing fine, and having no other complaints. Examination of Plaintiff's musculskeletal system showed mild discomfort with standing and ambulation. Dr. Privett encouraged Plaintiff to exercise and abstain from smoking.

On October 30, 2013, Plaintiff reported needing a primary care physician after he was "recently dismissed from disability." (Tr. 341) Plaintiff reported having severe back pain due to deformities of his legs and increased bleeding through his bowels since having an ulcer, but he did not want anything done until after deer season, even after Dr. Harness warned him he could bleed to death.

**I.**     <u>**Sleep Study Report**</u> (Tr. 263-78, 526-31)

Based on the May 2011 results of a CPAP/BIPAP titration, Dr. Dennis Daniels recommended CPAP therapy and behavioral therapy, including a weight loss program.

**J.**     <u>**Pulmonary Function Studies - Dr. John Yung**</u> (Tr. 322-28)

On October 5, 2012, Dr. John Jung completed a spirometric test with the results showing mild obstructive lung defect.  Plaintiff reported smoking a package of cigarettes a day.

**K.**     <u>**Treatment Records of Dr. Clint Vanlandingham**</u> (Tr. 472-76)

On July 30 and August 30, 2013, Dr. Vanlandingham treated Plaintiff's foot pain on referral from the pain management center.  Plaintiff reported having calluses and being barely able to walk.  Dr. Vanlandingham debrided a lesion on Plaintiff's left foot and scanned him for custom orthotics.

**L.**     <u>**MRI and X-ray Results**</u> (Tr. 321,485-88, 700-01)

An x-ray of Plaintiff's left knee on April 17, 2012, showed degenerative joint disease.

An x-ray of Plaintiff's lumbar spine on August 31, 2012, revealed no acute abnormality.

An MRI of Plaintiff's left knee on  September 27, 2012, showed small joint effusion and mild increased signal of the patellar tendon that may show normal degeneration or jumpers knee.

An x-ray of Plaintiff's lumbar spine on October 5, 2012, showed mild degenerative anterior lipping along the L2, L3-L4 vertebras and mild degenerative changes.

An MRI of Plaintiff's lumbar spine on April 3, 2014, showed a multilevel disc bulges and moderate to moderately severe stenosis and otherwise no acute findings.

**M.**     <u>**Internal Medical Examination - Dr. Barry Burchett**</u> (Tr. 557-62)

At the request of Disability Determinations, a state agency, Dr. Barry Burchett completed

a internal medicine examination on August 12, 2010. Plaintiff claimed that he is disabled due to his "pain [in] my knees and my shin." (Tr. 557) Dr. Burchett reviewed the orthopedic records from July 2001, evidencing a left tibia/fibular fracture and a tibial plateau fracture. Plaintiff complained "of pain in both knees when he walks on uneven ground" and trouble breathing in hot weather. (Id.)

Dr. Burchett observed Plaintiff to ambulate with a somewhat stiff gait, and "[h]e walked with a mild to moderately wide based gait." (Id. at 558) Examination of Plaintiff's dorsolumbar spine revealed "no tenderness to percussion of the dorsolumbar spinous processes. Straight leg test is negative in both the sitting and supine positions. The claimant is able to stand on one leg at a time without difficulty." (Id. at 559) Examination of Plaintiff's cervical and lumbar spine showed he had a normal range of motion in all areas. Dr. Burchett found Plaintiff had chronic bilateral knee pain, status post extensive third degree burns, history of hernatochezia, and uncontrolled hypertension, noncompliant. Dr. Burchett noted that Plaintiff has a full passive range of motion of all joints, and he was able to perform a single full squat without significant difficulty.

## V. Standard of Review and Analytical Framework

In a DIB and a SSI case, the burden is on the claimant to prove that he or she has a disability. See Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). Under the Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A). A plaintiff will be found to have a disability

"only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A) and 1382c(a)(3)(B). See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

Per regulations promulgated by the Commissioner, the ALJ follows a five-step process in determining whether a claimant is disabled. "During this process the ALJ must determine: '1) whether the claimant is currently employed; 2) whether the claimant is severely impaired; 3) whether the impairment is, or is comparable to, a listed impairment; 4) whether the claimant can perform past relevant work; and if not 5) whether the claimant can perform any other kind of work.'" Andrews v. Colvin, 791 F.3d 923, 928 (8th Cir. 2015) (quoting Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006)). "If, at any point in the five-step process the claimant fails to meet the criteria, the claimant is determined not to be disabled and the process ends." Id. (citing Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005). See also Martise v. Astrue, 641 F.3d 909, 921 (8th Cir. 2011).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). The ALJ's findings should be affirmed if they are supported by "substantial evidence" on the record as a whole. See Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008). Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a

decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue,

964 F.3d 959, 965 (8th Cir. 2010) (same).

Despite this deferential stance, a district court's review must be "more than an

examination of the record for the existence of substantial evidence in support of the

Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district

court must "also take into account whatever in the record fairly detracts from that decision." Id.

Specifically, in reviewing the Commissioner's decision, a district court is required to examine the

entire administrative record and consider:

1.   The credibility findings made by the ALJ.
2.   The claimant's vocational factors.
3.   The medical evidence from treating and consulting physicians.
4.   The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.
5.   Any corroboration by third parties of the claimant's impairments.
6.   The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (citation

omitted).

Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the

available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549,

556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing

court might have reached a different conclusion had it been the finder of fact in the first instance.

Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if

substantial evidence supports the Commissioner's decision, the court "may not reverse, even if

inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a

different outcome").

## VI.     Analysis of Issues Presented

In his pleadings, Plaintiff contends that the ALJ committed reversible error when:  (1) the ALJ adversely assessed Plaintiff's credibility; and (2) the ALJ found none of Plaintiff's impairments, either alone or in combination, met or medically equaled a listed impairment, Listing 1.04(C).  As explained below, the Court finds substantial evidence in the record as a whole supports the ALJ's decision that Plaintiff is not disabled within the meaning of the Act.

### A.     The ALJ's Adverse Credibility Determination

The Court first addresses the ALJ's adverse credibility determination.  An evaluation of Plaintiff's credibility is necessary to a full consideration of the ALJ's conclusion that none of Plaintiff's impairments amounted to a severe impairment.  The Eighth Circuit has instructed that the ALJ is to consider the credibility of a plaintiff's subjective complaints in light of the factors set forth in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  See also 20 C.F.R. §§ 404.1529, 416.929.  The factors identified in Polaski include:  a plaintiff's daily activities; the location, duration, frequency, and intensity of his symptoms; any precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of her medication; treatment and measures other than medication she has received; and any other factors concerning her impairment-related limitations.  See Polaski, 739 F.2d at 1322; 20 C.F.R. §§ 404.1529, 416.929. An ALJ is not, however, required to specifically discuss each Polaski factor and how it relates to a plaintiff's credibility.  See Partee v. Astrue, 638 F.3d at 860, 865 (8th Cir. 2011) (stating that "[t]he ALJ is not required to discuss methodically each Polaski consideration, so long as he acknowledged and examined those considerations before discounting a [plaintiff's] subjective

complaints") (internal quotation and citation omitted); <u>Samons v. Astrue</u>, 497 F.3d 813, 820 (8th Cir. 2007) (stating that "we have not required the ALJ's decision to include a discussion of how every <u>Polaski</u> factor relates to the [plaintiff's] credibility").

This Court reviews the ALJ's credibility determination with deference and may not substitute its own judgment for that of the ALJ. "The ALJ is in a better position to evaluate credibility, and therefore we defer to her determinations as they are supported by sufficient reasons and substantial evidence on the record as a whole." <u>Andrews</u>, 791 F.3d at 929 (citing <u>Cox v. Barnhart</u>, 471 F.3d 902, 907 (8th Cir. 2006)). <u>See also</u> <u>Gregg v. Barnhart</u>, 354 F.3d 710, 713 (8th Cir. 2003) (holding that "[i]f an ALJ explicitly discredits the [plaintiff's] testimony and gives good reasons for doing so, [the reviewing court] will normally defer to the ALJ's credibility determination"); <u>Pearsall</u>, 274 F.3d at 1218. In this case, the ALJ gave good reasons for discounting Plaintiff's credibility. Accordingly, the Court will defer to the ALJ in this regard.

Plaintiff contends that the ALJ failed to perform a proper credibility analysis because the ALJ found his daily activities to be inconsistent with his allegations of disability. As explained below, the ALJ's adverse credibility determination is well-supported and justified. The ALJ cited <u>Polaski</u> and appropriately applied the factors. Upon a review of the entire record, the Court concludes that the ALJ gave good reasons for the credibility determination and that determination is supported by substantial evidence.

In this case, the ALJ concluded that Plaintiff's "allegation that his impairments, either singly or in combination, produce symptoms and limitations of a severity to prevent all sustained work activity is not credible" and noted that he must consider the <u>Polaski</u> factors in addition to the objective medical evidence, when assessing Plaintiff's credibility. (Tr. 25-26) In evaluating

Plaintiff's credibility, the ALJ determined that Plaintiff was not fully credible because the objective medical record is inconsistent with his allegations regarding the severity of his impairments.

In support of his credibility findings, the ALJ noted that Plaintiff's impairments were controlled by treatment. Conditions which can be controlled by treatment are not disabling. Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) ("An impairment which can be controlled by treatment or medication is not considered disabling"); see Davidson v. Astrue, 578 F.3d 838, 846 (8th Cir. 2009); Medhaug v. Astrue, 578 F.3d 805, 813 (8th Cir. 2009). Likewise, Plaintiff received medical treatment for his allegedly debilitating impairments and that treatment was minimal. See Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006) (affirming ALJ's adverse credibility findings on, inter alia, lack of aggressive medical treatment).

Dr. Andreassen effectively treated Plaintiff's back pain with a medication regimen. The MRI results of Plaintiff's lumbar spine revealed no acute abnormality, degenerative disc disease, and moderate to moderately severe stenosis. Based on the MRI results, no medical provider found Plaintiff to have lumbar spinal stenosis resulting in pseudoclaudication. Pseudoclaudication can be a symptom of lumbar spinal stenosis and can cause leg pain while standing or walking. http://www.mayoclinic.org/diseases-conditions/spinal-stenosis/expert-answers/pseudoclaudication/faq-20057779. See Medhaug, 578 F.3d at 816 (affirming adverse credibility determination when repeated studies failed to support allegations of deterioration in functional abilities). The treatment records show that Plaintiff routinely reported that he found relief through the use of medications. This included relief from both pain and psychological symptoms, including reduced anger and fewer mood swings. Plaintiff's medical providers also noted improvement in his mood and anxiety symptoms with medications and found Plaintiff

benefitted from medication treatment.

Additionally, the absence of side effects from medication is a proper factor for the ALJ to consider when determining whether a claimant's complaints of disabling pain are credible. See Depover v. Barnhart, 349 F.3d 563m 577 (8th Cir. 2003) ("We [] think that it was reasonable for the ALJ to consider the fact that no medical records during this time period mention [Plaintiff] having side effects from any medication). The lack of medical evidence supporting Plaintiff's impairments was also proper consideration when evaluating his credibility, as was his failure to pursue more aggressive treatment. See Gonzales, 465 F.3d at 895

Apart from evidence of effective treatment, the ALJ also focused on the objective medical evidence and concluded it did not support Plaintiff's allegations regarding the severity of his impairments. See Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010) (absence of objective medical evidence to support the complaints is a factor to be considered); Barrett v. Shalala, 38 F.3d 1019, 1022 (8th Cir. 1994) (the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints). For example, the record shows Plaintiff did not receive substantial medical treatment until April 2009, when he sustained injuries in a house fire. Plaintiff's medical records documented, on a fairly consistent basis, that Plaintiff exhibited a normal gait and was able to ambulate independently without the use of assistive devices. Similarly Plaintiff was repeatedly encouraged to exercise and increase his activity. As noted above, the medical evidence also showed Plaintiff's medications improved his functioning and made his pain tolerable. The record shows that the ALJ adequately considered Plaintiff's treatment record. In so doing, the ALJ articulated the inconsistencies between the medical record

and Plaintiff's subjective statements.

Plaintiff also disagrees with the ALJ's conclusion that his daily activities detracted from his credibility. Plaintiff argues that his daily activities are not inconsistent with his subjective complaints. The ALJ questioned Plaintiff at the administrative hearing regarding his daily activities, and in his written opinion acknowledged Plaintiff's testimony that "his daily activities are limited, but included household chores, mowing the lawn with a riding mower, hunting, driving, and cooking. He does not use braces, wraps, or a cane.... He alleged ... difficulty climbing stairs, and limited capacity to walk." (Tr. 26) Plaintiff further testified that he also visits friends, usually attends church on Sundays, and struggles when he carries a fifty pound bag of dog food. The ALJ found that Plaintiff's daily activities are not consistent with the extent of Plaintiff's allegedly disabling impairments and, as such, bear upon his credibility. In his reply brief, Plaintiff acknowledges he can perform some daily activities including cooking occasionally, mowing the yard on a riding mower with difficulty, pain, and frequent breaks, light cleaning, light vacuuming, and occasional hunting and fishing with the aid of a four wheeler but the ability to perform these activities does not mean he has the residual functional capacity to perform light work as found by the ALJ.

Plaintiff argues that the ALJ erred in his assessment of the degree to which Plaintiff is restricted in his daily activities. Plaintiff is correct that "a claimant need not prove [he] is completely bedridden or completely helpless to be found disabled." Reed v. Barnhart, 399 F.3d 917, 923 (8th Cir. 2005) (noting that the Eighth Circuit "has repeatedly observed that the ability to do activities such as light housework and visiting friends provides little or no support for the finding that a claimant can perform full-time competitive work). Indeed, the Eighth Circuit "has

repeatedly stated that a person's ability to engage in personal activities such as cooking, cleaning, and hobbies does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity." Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998)  Yet Plaintiff's daily activities can also be considered as inconsistent with his subjective complaints of a disabling impairment, and may be considered by the ALJ in judging the credibility of complaints. See Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004) (holding that the ALJ properly considered that the claimant watched television, read, drove, and attended church in concluding that subjective complaints of pain were not credible).

By his own admission, Plaintiff is not bedridden.  During treatment, Plaintiff indicated that he likes to exercise, garden, cook, fix things, hunt, fish, ride dirt bikes and motorcycles, and he can do his own shopping, cooking, and cleaning without homemaker services.[3]  See Kamann v. Colvin, 721 F.3d 945, 951-52 (8th Cir. 2013) (affirming ALJ's credibility finding based on discrepancies).  The record in this case strongly suggests that Plaintiff was an avid hunter.  For example, at one point Plaintiff indicated that he already had his camouflage gear out in anticipation of turkey hunting season.  Even more noteworthy is the fact that, when warned of a potentially life-threatening bleeding risk, Plaintiff elected to postpone treatment until after deer hunting season.  See Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005) ("A failure to follow a recommended course of treatment also weighs against a claimant's credibility"); 20 C.F.R. §§ 404.1530, 416.930 (unjustified failure to follow prescribed treatment is grounds for denying disability).

Plaintiff's daily activities can fairly be seen as inconsistent with his subjective complaints

---

[3]During treatment, Plaintiff expressed interest in obtaining "part time sheltered employment which would not affect his application for disability."  (Tr. 376)

that would prevent him from performing work, and they were considered in judging the credibility of his complaints. See Pirtle v. Astrue, 479 F.3d 931, 935 (8th Cir. 2007) (affirming ALJ's credibility decision based, in part, on claimant's daily activities of driving a manual-transmission car, shopping, performing housework, fishing, attending church two to three times a week, caring for personal needs, and home-schooling her two children); Wagner v. Astrue, 499 F.3d 842, 852-53 (8th Cir. 2007) (finding a claimant's accounts of "extensive daily activities, such as fixing meals, doing housework, shopping for groceries, and visiting friends" supported the ALJ's conclusion that his complaints were not fully credible). Substantial evidence supports the ALJ's finding that Plaintiff's daily activities are inconsistent with his allegations of disabling symptoms. The undersigned finds therefore, that the ALJ properly considered Plaintiff's daily activities as another factor that weighed against the credibility of his subjective complaints.

The ALJ also properly considered that the lack of any necessary restrictions on his daily activities, or functional or physical limitations placed on Plaintiff by his physicians. See Moore v. Astrue, 572 F.3d 520, 525 (8th Cir. 2009) (holding that "[a] lack of functional restrictions is inconsistent with a disability claim"); Samons v. Astrue, 497 F.3d 813, 820-21 (8th Cir. 2007) (affirming adverse credibility determination, in part, by absence of any functional limitations placed on claimant who described disabling back pain). The record indicates that Plaintiff's treating sources never placed any substantial, meaningful restrictions on Plaintiff. To the contrary, Drs. Harness and Andreassen encouraged Plaintiff to exercise. Dr. Gayle also encouraged Plaintiff to lose weight, to exercise, and to stop smoking.

Based on the foregoing, the undersigned concludes that substantial evidence in the record as a whole supports the ALJ's adverse credibility finding in this case.

**B.** **Listing 1.04(C)**

At the third step of the sequential evaluation process, the ALJ determined that Plaintiff's impairments, either alone or in combination, did not meet or medically equal a listed impairment. Plaintiff contends that the ALJ erred in failing to make a determination as to Listing 1.04(C) (disorders of the spine). Plaintiff argues that his condition medically equals the listed requirement, and that the ALJ's decision did not adequately explain or support a finding to the contrary. Under 20 C.F.R. 404.1526(a), an impairment is medically equivalent to a listed impairment if "it is at least equal in severity and duration to the criteria of any listed impairment."

"The claimant has the burden of proving that his impairment meets or equals a listing" and "'[t]o meet a listing, an impairment must meet all of the listing's specified criteria'" Carlson v. Astrue, 604 F.3d 589, 593 (8th Cir. 2010) (quoting Johnson v. Barnhart, 390 F.3d 1967, 1070 (8th Cir. 2004)). A claimant will not be deemed to have met a listing merely because he has been diagnosed with a condition named in a listing and meets some of the criteria. McCoy v. Astrue, 648 F.3d 605, 612 (8th Cir. 2011); see also Sullivan v. Zebley, 493 U.S. 521, 530 (1990) ("An impairment that manifests only some of [the listing] criteria, no matter how severely, does not qualify.").

To meet the listed impairment of "disorders of the spine," a claimant not only must have a disorder resulting in the compromise of a nerve root or the spinal cord, but also must meet the specific symptoms and documentation requirements under 20 C.F.R. Pt. 404, Subpt. P, App. , § 1.04(A), (B), or (C). The additional requirements to meet § 1.04(C) are "[l]umbar spinal stenosis[4] resulting in pseudoclaudication, established by findings on appropriate medically

---

[4]Narrowing of the spinal canal. Stedman's Medical Dictionary, 1832 (28th Ed. 2006).

acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in § 1.00B(2)b." Dr. Bryan testified that there were no clear evidence in the extensive medical records showing Plaintiff had lumbar spinal stenosis resulting in pseudoclaudication. The ALJ accorded Dr. Bryan's hearing testimony and expert medical opinions significant weight inasmuch as they were supported by clinical signs, symptoms, and medical findings in the record. Under the regulations, "when evaluating a nonexamining source's opinion, the ALJ's evaluate[s] the degree to which these opinions consider all of the pertinent evidence in [the] claim, including opinions of treating and other examining sources." Wildman, 596 F.3d at 967 (quoting 20 C.F.R. § 404.1527(c)(3)).

Listing 1.04(C) requires an inability to ambulate effectively. The inability to ambulate effectively is further defined as "an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." § 1.00B(2)b(1). The ability to ambulate effectively is defined as having the capability of sustaining a reasonable walking pace over a sufficient distance so that the individual is able to carry out activities of daily living. § 1.00B(2)b(2). Examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches, or two canes; the inability to carry out routine ambulatory activities, such as shopping and banking; and the inability to walk a block at a reasonable pace on rough or uneven surfaces. Id. The ALJ found, based on physical examinations in the record, that Plaintiff had a normal gait and ambulated without assistance. (Tr. 27)

The ALJ also noted that Dr. Bryan "testified in substance that the claimant does not have a physical impairment that meets or equals the severity criteria of any listed impairment." (Tr. 24)

The ALJ accorded Dr. Bryan's hearing testimony significant weight as an impartial medical expert inasmuch as his opinions were supported by clinical signs, symptoms, and findings contained in the record. Although Dr. Bryan found Plaintiff's testimony regarding his difficulty walking on uneven surfaces to be credible, Dr. Bryan testified that he could not find that Listing 1.04, dealing with spinal stenosis leading to inability to ambulate effectively, is clearly met, noting that Plaintiff's inability to ambulate effectively is caused by his knees, not his spine.[5] The fact that the ALJ did not elaborate on this conclusion is not a reversible error, as long as the conclusion is supported by the record. Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011) ("There is no error when an ALJ fails to explain why an impairment does not equal one of the listed impairments as long as the overall conclusion is supported by the record.").

The record evidence shows that Plaintiff's limitations are not sufficiently extreme to render him unable "to ambulate effectively" as required by to satisfy Listing 1.04(C). See Clemons v. Astrue, 2010 WL 1406840, *4 (M.D. Tenn, April 6, 2010) (a Listing 1.04(C) impairment "must cause an inability to ambulate effectively"). The majority of the medical records show Plaintiff had a normal gait, although one examiner noted that Plaintiff had a somewhat stiff gait, and "[he walked with a mild to moderately wide based gait." (Tr. 558) None of the medical records reported the use of a hand-held device to assist Plaintiff in walking or the inability to walk on uneven or rough surfaces. During treatment, Dr. Andreassen found Plaintiff's gait and station to be normal based on his examination, and he found Plaintiff able to participate in an exercise program and to increase his activity. Plaintiff testified at the hearing that when he has to walk on unlevel ground or in the woods to hunt, he uses a stick or holds onto trees to stabilize himself,

---

[5]The undersigned notes that, during the internal medicine examination, Plaintiff complained "of pain in both knees when he walks on uneven ground." (Tr. 557)

and he is unable to walk a block without sitting down and taking a break. Plaintiff also testified

that he does not use braces, wraps, or a cane. The ALJ discounted Plaintiff's credibility but, even

if Plaintiff's testimony is fully credited, it does not necessitate a finding that he cannot effectively

ambulate. There is no evidence of an extreme limitation in Plaintiff's ability to walk. The

regulations direct that the determination as to whether a claimant can ambulate effectively is

"based on the medical and other evidence in the case record." 20 C.F.R. pt. 404, subpt. P, app. 1

§ 1.00(2)(a). The substantial evidence on the record does not support a finding that Plaintiff is

unable to ambulate effectively.

The undersigned notes that Plaintiff's daily activities also support the conclusion that

Plaintiff's impairment does not equal the severity of impairment contemplated by the listing, i.e.,

Plaintiff can drive a car, occasionally cook, do household chores, fish, and hunt.

The ALJ's conclusion that Plaintiff's impairment does not meet or medically equal the

requirements of § 1.04(C) is supported by the record. All of the evidence supports the ALJ's

conclusion, and the ALJ's failure to discuss his reasoning in detail is not reversible error in this

case. Even accepting Plaintiff's argument, the only evidence he cites in support of his inability to

walk on rough surfaces are his self-reports and hearing testimony. As discussed, the ALJ

reasonably determined that Plaintiff was not fully credible, and other evidence of record reflects

no significant issues with ambulation. Accordingly, the undersigned finds no error with regard to

the ALJ's findings at step three.

To the extent Plaintiff challenges the ALJ's consideration of his impairments in

combination, the undersigned determines that there was no error. The ALJ fully summarized all

of Plaintiff's medical treatment records and the opinion evidence of record, and discussed each of

Plaintiff's alleged impairments. The ALJ concluded that Plaintiff did not have "an impairment or combination of impairments that [met] or medically [equaled]" a listed impairment. (Tr. 24) Based on the foregoing, the undersigned finds that the ALJ sufficiently considered Plaintiff's impairments in combination. See Hajek v. Shalala, 30 F.3d 89, 92 (8th Cir. 1994) (conclusory statement that ALJ did not consider combined effects of impairments was unfounded when ALJ noted each impairment and found that impairments, alone or combined, were not of listing-level severity); see also Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992) (the ALJ sufficiently considered the claimant's impairments in combination by separately discussing the claimant's physical impairments, complaints of pain, and daily activities). "To require a more elaborate articulation of the ALJ's thought processes would not be reasonable." Id. (citing Gooch v. Secretary of H.H.S., 833 F.2d 589, 592 (6th Cir. 1987)).

Substantial evidence in the record supports the ALJ's conclusion that Plaintiff's impairments, either alone or in combination, failed to meet or medically equal a listed impairment.

## C.    Weight Given to Medical Opinions

Plaintiff also takes issue with the weight given to the opinions of Nurse Practitioner Kathleen Lasar, PMHNP-BC and Dr. Edwin L. Bryan. In particular, Plaintiff contends that the ALJ erred in affording the opinion of Ms. Lasar minimal weight regarding his mental ability to work.

In a letter December 29, 2011, in response to Plaintiff's counsel, Ms. Lasar, in part, found Plaintiff unable to sustain substantial gainful activity. Ms. Lasar also opined that Plaintiff "suffers significant impairment ..., as evidenced by difficulty concentrating and retaining information, mood instability and irritability, flashbacks and nightmares to previous trauma, specifically a fire in

2009 in which he suffered a brain injury which rendered him unconscious." (Tr. 547) Ms. Lasar concluded by opining that Plaintiff's "mental problem is marked and limits social functioning, concentration, persistence, and pace." (Tr. 538)

The ALJ gave "very little weight" to this opinion because opinions of Nurse Practitioners are generally not recognized as acceptable sources, finding that "[t]he opinion represents [an] other source opinion and is entitled to significantly less weight than an acceptable medical source opinion and there is no indication that she has any skills in determining levels of functioning in various work settings." (Tr. 28)

Regarding mental health conditions, only licensed physicians and licensed or certified psychologists are considered acceptable medical sources. Social Security Ruling 06-03P at *1 (2006). Acceptable medical sources are the only ones who may establish the existence of a medically determinable impairment; give a medical opinion; or be considered a treating source and thereby entitled to controlling weight. Id. Other medical sources include nurse practitioners, physician assistants, licensed clinical social workers, chiropractors, and therapists. 20 C.F.R. §§ 404.1513(d)(1), 416.913(d). "Information from these other sources cannot establish the existence of a medically determinable impairment. Instead, there must be evidence from an 'acceptable medical source' for this purpose." SSR 06-03P, 2006 WL 2329939. "[I]nformation from such other sources, [however], may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." Id.

First, to the extent Ms. Lasar opined that Plaintiff is disabled and unable to sustain substantial gainful activity, such an opinion "involves an issue reserved for the Commissioner and

therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005); House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007) (A physician's opinion that a claimant is "disabled" or "unable to work" does not carry "any special significance," because it invades the province of the Commissioner to make the ultimate determination of disability).

Furthermore, the ALJ properly determined that Ms. Lasar is not an acceptable medical source as defined by agency regulations. See 20 C.F.R. §§ 404.1513(a), 416.913(a). Thus, Ms. Lasar's opinion could be considered, but it was not entitled to controlling weight. See Social Security Ruling 96-2p (holding that for an opinion to be entitled to controlling weight it must come from a treating source as defined by 20 C.F.R. §§ 404.1502 and 416,902).

Here, Ms. Lasar did not include any medical bases for her opinions, and did not cite to any supporting medical findings. The letter is lacking any narrative explanation for the conclusory statements regarding Plaintiff's work limitations. Ms. Lasar's statement about Plaintiff's mental problem being marked and limiting his social functioning, concentration, persistence, and pace is a conclusory statement about Plaintiff's vocational abilities, not an explanation regarding Plaintiff's functionality. A medical provider's statement is given less weight when the statement does not contain an analysis or provides little explanation. See, e.g., Toland v. Colvin, 761 F.3d 931, 937 (8th Cir. 2014) (noting that "[a] treating physician's opinion deserves no greater respect than any other physician's opinion when [it] consists of nothing more than vague, conclusory statements.") (citation omitted).

Moreover, Ms. Lasar's opinion was also inconsistent with other medical evidence in the record. An ALJ can give less weight to a medical opinion when it is inconsistent with the

evidence in the record.  See Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007).  The ALJ

gave significant weight to Dr. England's opinions regarding Plaintiff's mental impairments.  Dr.

England, a psychologist and an acceptable source, found in substance that Plaintiff has affective,

cognitive, and anxiety disorders, and his mental impairments imposed only mild to moderate

mental limitations since 2012.  Dr. England opined that the record showed Plaintiff's mental

impairments to be mild in the area of reading, comprehension, and writing.  Likewise, mental

status examinations consistently showed that Plaintiff was oriented with no evidence of a thought

disorder.  Moreover, during a psychiatric evaluation, Dr. Salazar, another acceptable source,

found Plaintiff had presented elements of depression and PTSD, but Plaintiff had obtained benefit

from medication treatment.  Dr. Salazar noted that "[t]he patient is actively seeking help with his

disability process and apparently when submitting paperwork, the paperwork was thrown out as it

came from a nurse practitioner and not a physician, the reason why he prefers for me to undertake

his care directly."  (Tr. 380)

       The ALJ gave significant weight to Dr. Bryan's opinion regarding Plaintiff's physical

limitations.  Dr. Bryan also gave an opinion during his hearing testimony with respect to Plaintiff's

mental impairments precluding Plaintiff from performing sedentary work, but Dr. Bryan

acknowledged that he was testifying on a vocational basis outside of his area of expertise.  A

physician's conclusory statement of disability without supporting evidence does not overcome

substantial medical evidence supporting the Commissioner's decision.  Loving v. Dept. of Health

and Human Servs., 16 F.3d 967, 971 (8th Cir. 1994).  A provider's opinion that is based upon the

provider's understanding of the relevant disability criteria, and not on any medical evidence, is not

entitled to any deference.  See House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007) ("A treating

physician's opinion that a claimant is disabled and cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination"); <u>Baker v. Barnhart</u>, 457 F.3d 882, 894 (8th Cir. 2006) (A physician's opinion regarding a claimant's ability to work within a particular classification is not a "medical opinion"); <u>Smallwood v. Chater</u>, 65 F.3d 87, 89 (8th Cir. 1995) (An opinion as to whether a claimant can find work or be gainfully employed is outside the province of medical doctors).  <u>See</u> <u>also</u> 20 C.F.R. § 404.1527 ("We will not give any special significance to the source of an opinion on issues reserved to the Commissioned described in paragraphs (e)(1) and (e)(2) of this section," i.e. that a claimant is disabled, or that a claimant's impairment meets or equals a listed impairment.) Therefore, based on all of the above, the undersigned finds that the ALJ did not err in giving any weight to the opinion of Dr. Bryan that Plaintiff's mental impairments precluded him from performing sedentary work.  This statement about vocational ability is outside the area of his expertise.

Nevertheless, the ALJ's RFC assessment contained functional limitations fairly addressing Plaintiff's mental limitations, including the limitation of "performing more than simple, repetitive tasks with no close interaction with the general public or reading and writing."  (Tr. 25)  Such limitations appear to be consistent with some of those described by Dr. Lasar.  Consistent with Dr. England's opinion, the ALJ found that Plaintiff had mild limitations in his daily activities, and moderate limitations in maintaining social functioning and concentration, persistence, or pace. Because the ALJ properly gave less weight to an "other medical opinion" in the record that was not supported by medical evidence, this Court finds that the ALJ committed no error.

**VII.  Conclusion**

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole.  Although Plaintiff articulates why a different conclusion might have been reached, the ALJ's decision, and, therefore, the Commissioner's, was within the zone of choice and should not be reversed for the reasons set forth above.  Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011).  Accordingly, the decision of the ALJ denying Plaintiff's claims for benefits should be affirmed.

**IT IS HEREBY ORDERED** that the decision of the Commissioner be **AFFIRMED**.  A separate Judgment in accordance with this Memorandum and Order is entered this same date.

Dated this 22nd day of September, 2016.

/s/ John M. Bodenhausen
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE